*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

2 CROOKED CREEK, LLC and RUSSIAN FERRO ALLOYS, INC.,

        Plaintiffs-Appellants/Cross-Appellees,

v

CASS COUNTY TREASURER,

        Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
March 14, 2019

No. 342797
Court of Claims
LC No. 14-000181-MZ

Before: SAWYER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Plaintiffs, 2 Crooked Creek, LLC ("2CC") and Russian Ferro Alloys, Inc. ("RFA"), sought monetary damages under MCL 211.78*l* following defendant's tax foreclosure of certain property. Plaintiffs claimed that they had no notice of the foreclosure proceedings. The Court of Claims involuntarily dismissed plaintiffs' claims after considering plaintiffs' proofs during a bench trial, in accordance with MCR 2.504(B)(2). Plaintiffs now appeal by right. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

### A. THE PRIOR APPEAL

A related case was previously before this Court and provides the relevant background to the case at bar. *In re Petition of Cass Co Treasurer for Foreclosure*, unpublished per curiam opinion, issued March 6, 2016 (Docket No. 324519) (*In re Cass Co Treasurer*), lv den 500 Mich 882 (2016), cert den ___ US ___; 138 S Ct 422 (2017), was issued as a result of plaintiffs'

-1-

appeal of the Cass Circuit Court decision in the underlying foreclosure action that plaintiffs assert gave rise to their claim for damages under MCL 211.78*l* in this case.[1]

In July 2010, 2CC, an Indiana limited liability company, purchased a parcel of vacant land located in Penn Township, Cass County, Michigan for $820,000. The real estate agreement effectuating the sale listed 2CC's address as "36 Bradford Lane, Chicago, IL 60523," was executed by Sergi Antipov as "the Manager of Kava Management Company, LLC, the Manager of 2 Crooked Creek, LLC," and was subsequently filed with the Cass County Register of Deeds. On July 20, 2010, the Cass County Register of Deeds recorded the Trustee's Deed, which provided that subsequent tax bills should be sent to "2 Crooked Creek LLC" at "36 Bradford Lane, Chicago, IL 60523." "Antipov later attested that he lived at 36 Bradford Lane, Oak Brook, Illinois 60523, until June 15, 2011." *In re Cass Co Treasurer*, unpub op at 2.

> Property taxes were not paid for the property for 2011. In 2013, [the Cass County Treasurer] initiated forfeiture and foreclosure proceedings on the property pursuant to the General Property Tax Act ("GPTA"), MCL 211.78 *et seq*. On January 14, 2013, Title Check, LLC (Title Check), acting as [the Cass County Treasurer's] agent, sent a notice of forfeiture regarding 2011 real property taxes for the property in question, as required by MCL 211.78f. The January 14, 2013 notice letter was sent by certified mail, return receipt requested, to 36 Bradford Lane, Chicago, IL 60523 (the address identified in the deed for the receipt of tax bills). Because 60523 is actually the zip code for Oak Brook, not Chicago, notice of the letter was delivered on January 16, 2013, to 36 Bradford Lane, Oak Brook, IL 60523. The letter was left unclaimed, and on February 15 the letter was returned to Title Check marked "Unclaimed—Unable to Forward."

> On April 9, 2013, [the Cass County Treasurer] prepared a certificate of forfeiture as required by MCL 211.78g, and recorded it with the Cass County Register of Deeds on April 12, 2013. On May 5, 2013, Title Check sent a notice of inspection via regular first class mail addressed to 2 Crooked Creek at 36 Bradford Ln, Oak Brook IL 60523.[2] The letter identified the property and stated that because of unpaid 2011 taxes, the property would be subject to inspection and posting of notice on June 17, 2013. The letter also stated that the property was in the process of foreclosure, and that anyone with an interest in the property should immediately contact [the Cass County Treasurer].

---

[2] After the January 14, 2013 notice letter was delivered to Oak Brook instead of Chicago, [the Cass County Treasurer] addressed all subsequent notices to Oak Brook, rather than Chicago.

---

[1] Defendant's cross-appeal asserts that this opinion required dismissal of plaintiffs' claims under res judicata and collateral estoppel.

Title Check performed a title search of the property, which was completed on June 3, 2013. [The Cass County Treasurer] represented in its brief before the trial court that the title search was initiated on or before May 1. The title search revealed that the only recorded interests in the property were the deed and real estate agreement, an easement in favor of Indiana Michigan Power Company, and the certificate of forfeiture.

On May 28, 2013, KAVA Holdings, LCC, an Alaska limited liability company, of which 2CC is a wholly owned subsidiary, and RFA, an Indiana corporation, entered into a mortgage agreement regarding the property, in the amount of $3,500,000. The mortgage agreement was subsequently recorded with the Cass County Register of Deeds on July 10, 2013.

On June 5, 2013, [the Cass County Treasurer] filed a petition for foreclosure which sought to foreclose (for unpaid taxes) on approximately 579 separate parcels of real property described in Schedule A of the petition pursuant to MCL 211.78h(1), including the property owned by 2CC. The trial court scheduled a hearing on the petition for February 18, 2014.

On June 18, 2013, Katelin Makay, a land examiner working for Title Check, visited the property and determined that the property appeared to be occupied. She was unable to personally meet with any occupant, however, so she posted on the property, in a conspicuous manner, a notice of show cause hearing and judicial foreclosure hearing. Makay posted the notice in a window next to a double door of the house on the property, took a photograph of the posted notice, and attached that photograph to her inspection worksheet.

James Frye, president of Shoreline Development Company, attested that he was at the property on or shortly after June 18, 2013, because his company was building a house there for 2CC. He saw the notice of the show cause hearing and the judicial foreclosure hearing on a window next to the front door of the house, and he then directly contacted "a representative of 2 Crooked Creek, LLC by telephone and advised them of the posted notice and was advised by the representative of 2 Crooked Creek, LLC that the matter would be taken care of." Randy Bennett, principal of Bennett Painting, and Ed Lijewski, superintendent for Shoreline Development Company, both attested that they also were at the property on or shortly after June 18, 2013, saw the posted notice, and were present when Frye contacted a representative of 2CC about the notice.

However, Antipov stated in an affidavit that he and Douglas Anderson were the only representatives of 2CC, that Frye knew they were the only representatives of 2CC, and that Frye did not tell him at any time of any notice posted on the property. Anderson stated in an affidavit that he is the registered agent for 2CC, and that he regularly spoke with Frye, but that Frye at no time informed him of the notice posted on the property.

On August 20, 2013, Title Check sent a notice letter via first class mail of the show cause hearing and the judicial foreclosure hearing to 2CC at the 36 Bradford Lane address in Oak Brook. Title Check sent another notice letter via first class mail to the same address on October 30, 2013, which also indicated that notice of foreclosure would be published between December 2013 and February 2014.

On December 6, 2013, a notice of show cause hearing and judicial foreclosure hearing was sent via certified mail to 2CC at 36 Bradford Lane, Oak Brook, IL 60523. The December 6, 2013 notice letter, sent pursuant to MCL 211.78i(7), included the date the property was forfeited to [the Cass County Treasurer], a statement that 2CC could lose its interest in the property as a result of the foreclosure, a legal description, parcel number, and street address of the property, the person to whom the notice is addressed, the total amount to redeem the property as of March 1, 2013 ($14,743.24), the date and time of the show cause hearing (January 15, 2014), the date and time of the foreclosure hearing (February 18, 2014), and a statement that unless the forfeited delinquent taxes, penalties, interest and fees were paid on or before March 31, 2014, 2CC would lose its interest in the property and title to the property would absolutely vest with [the Cass County Treasurer]. Martin J. Spaulding, general manager of Title Check, stated in an affidavit that the December 6, 2013 notice letter was returned to Title Check on January 14, 2014 marked "Refused—Unable to Forward." On December 20, 2013, a copy of that same notice letter was sent via first class mail to 2CC at the same address.

On December 19, 2013, December 26, 2013, and January 2, 2014, a notice of show cause hearing and judicial foreclosure hearing was published in the Cassopolis Vigilant, a weekly newspaper circulated, printed, and published in Cass County, Michigan. The notice contained a list of properties subject to foreclosure, and indicated that 2CC owed $14,743.24 as of March 1, 2013, for the subject property, identified by parcel number. The notice also included the dates of the show cause hearing and the judicial foreclosure hearing, and indicated that title to the property would vest absolutely in the foreclosing governmental unit if the delinquent payments were not paid by March 31, 2014.

The show cause hearing took place in January 2014. The record does not indicate who did or did not appear at the hearing, but suggests that no one appeared on behalf of 2CC.

On February 18, 2014, the hearing on the petition for foreclosure was held as scheduled, at which no one appeared on behalf of 2CC to contest the foreclosure. The trial court made the following findings of fact:

1. that as required by MCL 211.78k(5)(f) all persons entitled to notice and an opportunity to be heard have been provided that notice and opportunity and have been afforded due process as required by MCL 211.78(2).

2. that the County Treasurer of the County of Cass or her Agents have complied with the procedures for provision of notice by mail, for visits to forfeited property, and for publication as found in MCL 211.78i, and

3. that each person entitled to notice was provided proper notice or if not so notified either:

(i) had constructive notice of the hearing under this section by acquiring an interest in the property after the date of the notice of forfeiture was recorded under MCL 211.78g.

(ii) appeared at the hearing or filed written objections with the clerk of the circuit court prior to the hearing or

(iii) prior to the hearing had actual notice of the hearing

The trial court ordered that a judgment of foreclosure be entered based on forfeited unpaid delinquent taxes, interest, penalties, and fees for each of the listed properties, including the property owned by 2CC. The trial court further stated that fee simple title to the foreclosed property would vest absolutely in Cass County, with no further right of redemption, if the delinquent balance was not paid on or before March 31, 2014.

Anderson stated in his affidavit that he first learned of the judgment of foreclosure on April 18, 2014, when he received a telephone call from Spaulding on behalf of Title Check, in which Spaulding asked him about the forfeiture and foreclosure and inquired whether Anderson would be attending the auction for the property. Anderson further stated that the telephone number at which Spaulding called him is not a listed number, yet Spaulding was able to obtain it from some source, and that Spaulding could have called him prior to March 31, 2014, when the foreclosure became final. Anderson stated that he did not receive any notices of tax assessments, the certificate of foreclosure, the show cause hearing, or the foreclosure action on the property. Antipov also stated in his affidavit that he did not receive any notices of tax assessments, the certificate of foreclosure, the show cause hearing, or the foreclosure action, and that he first learned of the judgment of foreclosure when Anderson advised him of the telephone call from Spaulding.

On July 3, 2014, [2CC and RFA] moved the trial court to set aside the judgment of foreclosure. They claimed that they did not receive constitutionally sufficient notice of the foreclosure proceedings, such that they were deprived of their property interests without due process of law. Specifically, [they] argued that [the Cass County Treasurer] knew that the 36 Bradford Lane address was not an address to which it could send a notice that was reasonably calculated to inform 2CC of the pending foreclosure. According to [2CC and RFA], [the Cass County Treasurer] did not make reasonable efforts to determine an address reasonably calculated to provide 2CC with notice, and did not perform a business records search as required by statute. Furthermore, the mortgage agreement with

RFA recorded on July 10, 2013, contained correct addresses for [2CC and RFA], and if notice had been sent to those addresses [2CC and RFA] would have received notice of the foreclosure action. Finally, [2CC and RFA] argued that the deprivation of [their] due process rights was particularly egregious because Title Check had actual knowledge of how to contact 2CC, as evidenced by the telephone call made by Spaulding to Anderson shortly after the foreclosure became final.

The trial court denied [2CC and RFA's] motion, finding that [the Cass County Treasurer] met the initial statutory notice requirements under MCL 211.78i, and that [it] had no reason to believe notice was insufficient. The trial court held that [the Cass County Treasurer] had no statutory duty to search Indiana business records for 2CC's address. The trial court found that due process requirements were met []because [the Cass County Treasurer] sent certified mail to the address listed in the deed, sent several first class letters to that address, posted notice on the property, and published notice in a newspaper. The trial court found that taken together, those actions reflected efforts reasonably calculated to inform interested parties and complied with both statutory and case authority, and noted that the presence of actual notice is not a deciding factor in the analysis. Regarding RFA, the trial court found that because the mortgage had not yet been recorded when [the Cass County Treasurer] performed its title check, and because the certificate of foreclosure was recorded before the mortgage, [the Cass County Treasurer] had no duty to provide RFA with any additional notice of the foreclosure. [*Id.*, unpub op at 2-6.]

Plaintiffs appealed to this Court, which determined that the relevant question was whether plaintiffs "were afforded notice that satisfies due process, not whether [defendant] met each provision and requirement of the GPTA." *Id.*, unpub op at 7. This Court held that RFA was not entitled to notice beyond that contained in the certificate of foreclosure because the certificate was recorded before RFA obtained its interest in the property. *Id.* This Court then considered all of the measures taken by defendant to provide notice to 2CC, concluded that defendant "performed constitutionally sufficient follow-up measures to provide 2CC with the notice necessary to satisfy the minimum requirements of due process," and affirmed the trial court's denial of plaintiff's motion to set aside the judgment of foreclosure. *Id.*, unpub op at 8-9. Plaintiffs' subsequent request for reconsideration, application for leave to our Supreme Court, request for reconsideration to our Supreme Court, and application for certiorari to the United States Supreme Court were all denied.

## B. THE CURRENT APPEAL

Around the same time that plaintiffs filed their motion to set aside the judgment in Cass Circuit Court, plaintiffs initiated the instant litigation in the Court of Claims. The trial court issued a stay pending resolution of this Court's Docket No. 324519.

At trial, Spaulding, general manager of Title Check, testified that Title Check used first-class mail to test addresses "to see if we can find any bad addresses. If we find bad addresses or get information indicating that a parcel is—that the mail piece has been forwarded, we can

-6-

incorporate those addresses into our system." Spaulding conceded that as of February 15, 2013, his office had notice that the mail was unable to be forwarded and was unclaimed. Spaulding agreed that the notice of show cause hearing and notice of foreclosure hearing were sent by certified mail to the Oak Brook address and returned "refused," but that was not an indication of a bad address. He agreed that 2CC did not receive notice of the show cause by the certified letter, but noted that Title Check sent the same notice to the address by first-class mail at the same time and that letter was not returned. He testified that it was "not uncommon with certified mail" and that "unable to be forwarded" did "not necessarily indicate that address is by any means bad. It means there's no address forwarding order on file for anybody theoretically that has moved from that address." Spaulding indicated that there was no statutory requirement for locating another address and re-sending the notice when the notice came back returned and, in any case, he was not sure what purpose it would serve "because as far as we knew, this was a good address. It was simply unclaimed. There's no indication that they're not at this address so we had no reason to believe it was not a good address. It's very common for mail to be unclaimed."

Spaulding conceded that he wrote in an email after the foreclosure his "hunch" that "they may not be getting mail from the address for some reason." Spaulding was responding to an email from defendant indicating that plaintiffs were at the county getting estimates and permits and defendant wanted to let them know they did not own the property anymore. After reviewing the file, it appeared to Spaulding that plaintiffs were not "acknowledging" their mail; he conceded that the email said "getting," and noted that "[i]n a perfect world maybe I would have phrased it as acknowledge." Spaulding also testified that not "getting" mail can include someone bringing it into the house and not giving it to the intended recipient, not that it's a bad address. Spaulding testified that the duty to follow up on an address would be triggered if the mail said something like "not at this address, forward order expired, [or] deceased," that the final letter came back refused did not indicate it was a bad address—it could have been a good address and they just refused. He testified that on notification from the post office that the address was Oak Brook and not Chicago, they had adjusted that in their records. He indicated that any mail that got returned to their office was placed in the file and that none of the first-class mail was returned.

Spaulding testified that Title Check searched through the Michigan Business Entity index to determine an address or registered agent for 2CC even though the title in this case indicated that the property was held by an Indiana company. He testified that state departments change names regularly and that a reference in MCL 211.78i(2)(d) to the Department of Labor and Economic Growth, (which no longer exists in Michigan as it is now known as the Department of Licensing and Regulatory Affairs (LARA)), was an indication to check the Michigan Business Entity index. The trial court ruled sua sponte that "Department of Labor and Economic Growth" meant Michigan and did not mean to check other states. Spaulding testified that an Indiana company would only show up in LARA's records if it had a Michigan agent; otherwise it would be unregistered.

Spaulding stated that Title Check always erred on the side of posting the notice at a property to "remove the argument about the fact that I was camping there but my tent was not there that day." He further testified that, in addition to the site visit by Katelin Makay, publication occurred on December 19 and 26, 2013 and January 2, 2014.

Antipov testified that he lived at 50 Baybrook, Oak Brook, IL 60523 and had been there since August 2011. He had previously lived at 36 Bradford in Oak Brook for two years, leasing it while he built his house at 50 Baybrook. He clarified that it could have been June 2011, but that his lease ran out in August 2011, and he was moving things to the new house in the process. After moving from 36 Bradford, Antipov had arranged with the post office to forward his mail and that was supposed to last 12 months. Defendant's counsel attempted to impeach Antipov with evidence of Illinois car titles listing the 36 Bradford address; there was a dispute over whether the documents also evidenced registration. Antipov testified that he used the Baybrook address for any cars he purchased after his move.

Antipov testified that he never received any tax bills, notices about unpaid taxes, notice of a certificate of forfeiture, the notice with the inspection deadline, the letter notifying 2CC about publication deadlines, the notice of show cause hearing and judicial foreclosure, or the judgment of foreclosure. He testified that he had never seen the certificate of foreclosure of real property before and neither he, nor anyone on behalf of 2CC, received it; if they had, he would have paid the funds due. He testified that had the notice of the certificate of foreclosure reached him, he would have paid the taxes because what was due was "nothing compared to the value of the property," and he noted that he did remit the funds when he found out about it, but the check was returned as unaccepted. Antipov stated that he always claimed his certified mail, never refused it, and implied that if any notice had been delivered to him by certified mail, he would have accepted or claimed it.

Antipov testified that he learned of the foreclosure in mid-April 2014 when Anderson called him. Prior to that time, he had no notice, whatsoever, that the property was in danger of foreclosure. However, he admitted that he never updated his address with defendant for the property he owned in Michigan because he "didn't think that there was anything being issued to me to begin with. [He] was waiting for the occupancy certificate." Antipov testified that he did not think he would get a tax bill until an occupant moved into the property.

Antipov was the owner and manager of KAVA Management, LLC, which itself is the manager of 2CC. He testified that Anderson became the registered agent for 2CC sometime in 2011 or 2012 and the address for 2CC was changed to Mishawaka, Indiana. Antipov signed the July 2013 mortgage on behalf of KAVA Holdings, LLC and Kava Management for 2CC, and the address for KAVA provided in the mortgage was 50 Baybrook. The property was purchased vacant, and 2CC was to manage the building of a house on the property. Antipov opined that the $3.5 million mortgage represented the value of the house and the property itself. There was a general contractor on site and Antipov believed that the contractor was interacting with the township throughout the building process. Antipov testified that, in June 2013, the house was not finished and there was no certificate of occupancy, but it was close to the end.

Anderson, the current president of RFA, testified that he never received notice of tax delinquency or deficiency with respect to RFA's mortgage. He conceded that nothing in the first paragraph of the mortgage mentioned 2CC. The money from the loan reflected in the mortgage was used to purchase a different property by a different subsidiary of KAVA; none of the money went to 2CC. He did not know whether an expert was going to testify that the foreclosed property was worth $1.65 million, but he believed it was worth more than that because they paid $820,000 for the land and almost $2.6 million for the house that was built. Anderson admitted

that he did not do a title search before drafting and filing the mortgage, and the Board of Licensing was not consulted before the mortgage was recorded. Anderson agreed that the certificate of forfeiture had been recorded on April 12, 2013 and that if RFA, 2CC, or anyone else had done a title search, they would have known about the county's interest in the property for unpaid taxes.

Defendant moved for a directed verdict, arguing that it had shown that it provided proper notice and that 2CC received the notice required by statute and that RFA was not entitled to notice. After requesting briefing, the trial court then issued its opinion and order on defendant's motion for directed verdict and, construing it "as a motion for involuntary dismissal under MCR 2.504(B)(2) in this bench trial," granted the motion. In its opinion, the trial court noted that "the issue of whether plaintiff received due process has already been fully litigated. The issue here, as discussed *infra*, is for monetary damages based on whether plaintiff received any notice required under the act." It noted that plaintiffs brought their action under MCL 211.78*l* of the GPTA, "which creates a cause of action in this Court for property owners who allege that they did not receive *any notice* under the GPTA." The opinion recognized that " 'statutory notice rights can be violated, giving rise to an action for money damages, yet minimum due process may have been satisfied.' " Thus, the court concluded that plaintiffs had to establish that they did not receive any notice, notwithstanding the fact that the foreclosing governmental unit satisfied minimum due process requirements.

The trial court then noted:

> By and large, plaintiffs' briefing in this case contends that defendant should have taken additional efforts to locate 2 Crooked Creek's address in light of the fact that the certified mailings were returned. They also argue, without citing any pertinent authority, that defendant should have continually checked the county register of deeds, thereby discovering the later-recorded mortgage with RFA, and thereafter should have known they needed to provide notice to RFA. They also contend that they never received any of the notices required under the GPTA.

The trial court determined that RFA was not entitled to notice under the GPTA. It further held that 2CC was not entitled to relief on the facts presented. It indicated that an additional reason to grant defendant's motion was that 2CC had failed to present any evidence of its damages because there was no testimony establishing the fair market value of 2CC's interest in the property at the time of the foreclosure. It noted that there was testimony about what was paid for the property and about the loan, but no testimony regarding 2CC's interest in the property at the time of the foreclosure as that interest had been affected by the note and mortgage held by RFA.

The trial court denied plaintiffs' motion for reconsideration. Plaintiffs now appeal by right.

## II. TREATING DEFENDANT'S MOTION AS ONE FOR "INVOLUNTARY DISMISSAL"

Plaintiffs first argue that the trial court erred when it re-characterized defendant's motion for directed verdict as a motion for involuntary dismissal. They argue that such a change in how the trial court reviewed the motion was significant because plaintiffs were not given the

advantage of the most favorable interpretation of the evidence. We conclude that the trial court properly treated the motion as one for involuntary dismissal.

Plaintiffs are correct that the trial court's treatment of defendant's motion as one for involuntary dismissal as opposed to a directed verdict has significant consequences. The standard of review for a trial court's decision depends on the rule under which it was granted. *Williamston Twp v Hudson*, 311 Mich App 276, 286; 874 NW2d 419 (2015). Both motions for a directed verdict under MCR 2.517 and motions for involuntary dismissal under MCR 2.504(B) test the factual support for a claim. *Id*. at 287. However, a motion for a directed verdict requires all factual disputes to be resolved in favor of the nonmoving party and does not permit any credibility determinations, but "a motion for involuntary dismissal calls upon the trial judge to exercise his function as trier of fact, weigh the evidence, pass upon the credibility of witnesses and select between conflicting inferences. Plaintiff is not given the advantage of the most favorable interpretation of the evidence." *Id.* (quotation marks and citations omitted).

However, the fact remains that when a trial court, sitting as the finder of fact, is asked to direct a verdict, the motion is actually one for involuntary dismissal. *Williamston Twp*, 311 Mich App at 288-289; *Samuel D Begola Servs, Inc v Wild Bros*, 210 Mich App 636, 639; 534 NW2d 217 (1995). In fact, even when the parties and the lower court erroneously categorize a motion as one for directed verdict, we will review as one for involuntary dismissal. *Williamston Twp*, 311 Mich App at 288-289 ("[W]here a court's opinion does not invoke the proper court rule supporting its ruling, we may look to the substance of the holding to determine which rule governs.") *Adair v Michigan*, 497 Mich 89, 99 n 18; 860 NW2d 93 (2014) ("[T]he appropriate label is one for involuntary dismissal because it is a case without a jury.") Where, as here, the trial court noted the applicable court rule, instead of waiting for this Court to do so, there is no error. The trial court properly construed defendant's motion as one for an involuntary dismissal under MCR 2.504(B)(2).

III. WHETHER 2CC RECEIVED THE NOTICE REQUIRED BY MCL 211.78*l*

Plaintiffs contend that the trial court erred when it concluded that 2CC received the notice required by MCL 211.78*l*. In effect, plaintiffs argue that MCL 211.78*l* requires that the owner of the interest in the property receive *actual* notice; constructive notice is insufficient. We disagree.

In order to determine whether the trial court erred, this Court must interpret the requirements of MCL 211.78*l*. "Statutory interpretation is a question of law subject to review de novo on appeal." *Sandy Pines Wilderness Trails, Inc v Salem Twp*, 232 Mich App 1, 11; 591 NW2d 658 (1998) (quotation marks and citation omitted). This Court reviews for clear error a trial court's decision on a motion for dismissal under MCR 2.504. *Rodenheiser v Duenas*, 296 Mich App 268, 272; 818 NW2d 465 (2012). "A finding is clearly erroneous where, although there is evidence to support the finding, the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id*.

MCL 211.78*l*(1) provides:

If a judgment for foreclosure is entered under section 78k and all existing recorded and unrecorded interests in a parcel of property are extinguished as

provided in section 78k, the owner of any extinguished recorded or unrecorded interest in that property who claims that he or she did not receive *any* notice required under this act shall not bring an action for possession of the property against any subsequent owner, but may only bring an action to recover monetary damages as provided in this section. [Emphasis added.]

There is no dispute that plaintiffs received constitutionally adequate notice, as those claims were litigated in the previous appeal. However, plaintiffs assert MCL 211.78*l* awards damages for anything less than *actual* notice. Such an interpretation flies in the face of the statute's actual language.

> The principles of statutory interpretation are well established. The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. And the statutory language is the best indicator of the Legislature's intent. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). Importantly, statutory language should be construed reasonably, keeping in mind the purpose of the act. *Draprop Corp v City of Ann Arbor*, 247 Mich App 410, 415; 636 NW2d 787 (2001). [*In re Wayne Co Treasurer for Foreclosure of Certain Lands for Unpaid Prop Taxes*, 265 Mich App 285, 290-291; 698 NW2d 879 (2005).]

"If the language used is clear, then the Legislature must have intended the meaning it has plainly expressed, and the statute must be enforced as written." *Nation v WDE Electric Co*, 454 Mich 489, 494; 563 NW2d 233 (1997).

MCL 211.78*l* does not use the term "actual" notice. It uses the term "any" notice. "[C]ourts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012) (quotation marks and citation omitted). Additionally, this Court "will not read additional requirements into a clear and unambiguous statute that are not within the Legislature's manifest intent." *TMW v Dep't of Treasury*, 285 Mich App 167, 180; 775 NW2d 342 (2009). Interpreting MCL 211.78*l* to require actual notice would render the Legislature's choice of the word "any" nugatory and simultaneously read an additional requirement into the statute that simply is not present.

"The Legislature is deemed to be aware of the meaning given to the words it uses . . .." *Anzaldua v Band*, 457 Mich 530, 543; 578 NW2d 306 (1998). In *People v Harris*, 495 Mich 120, 131; 845 NW2d 477 (2014), our Supreme Court considered the definition of "any" when interpreting a statute.

> " 'Any' is defined as: 1. one, a, an, or some; one or more without specification or identification. 2. whatever or whichever it may be. 3. in whatever quantity or number, great or small; some. 4. every; all . . . ." [*Id.*, quoting *Random House Webster's College Dictionary* (1997).]

It noted that "it is difficult to imagine how the Legislature could have cast a broader net given the use of the words "any act" . . . . *Id.* at 132. The same reasoning applies here. The Legislature

could have used the term "actual" notice, but it did not. "Because 'any' is commonly understood to encompass a wide range of things," *id.*, the Legislature did not intend to limit the notice referenced in MCL 211.78*l* to actual notice. Instead, when the Legislature stated that an owner must claim that it "did not receive any notice required under the act," it referred to the situation when an owner received no notice whatsoever.

Plaintiffs' conclusion that only actual notice is sufficient to preclude damages under MCL 211.78*l* is not based on the statute, but comes from language in *In re Petition by Treasurer of Wayne Co for Foreclosure*, 478 Mich 1; 732 NW2d 458 (2007) (*Perfecting Church*). In *Perfecting Church*, our Supreme Court considered the constitutionality of the GPTA and held that, because MCL 211.78k encompassed all foreclosures, including those in which constitutionally inadequate notice was provided, the GPTA was unconstitutional as applied to property owners that did not receive constitutionally adequate notice. *Id.* at 10-11. In making this decision, the Supreme Court noted:

> [T]he plain language of the [MCL 211.78k] simply does not permit a construction that renders the statute constitutional because the statute's jurisdictional limitation encompasses all foreclosures, including those where there has been a failure to satisfy minimum due process requirements, as well as *those situations in which constitutional notice is provided, but the property owner does not receive actual notice*. In cases where the foreclosing governmental unit complies with the GPTA notice provisions, MCL 211.78k is not problematic. Indeed, MCL 211.78*l* provides in such cases a damages remedy that is not constitutionally required. [*Id.* (emphasis added).]

Plaintiffs argue that because our Supreme Court distinguished between a failure to satisfy minimum due process requirements and "those situations in which constitutional notice is provided, but the property owner does not receive actual notice," and then referenced the monetary damage provision provided by MCL 211.78*l*, it necessarily held that actual notice is the standard required under the statute.

However, apart from the fact that the interpretation flies in the face of the statute's actual language, the statement suggesting that actual notice is required constitutes dictum. Language is "clearly dictum" when "the question was neither at issue nor expressly considered." *People v Aaron*, 409 Mich 672, 722; 299 NW2d 304 (1980). In *Perfecting Church*, our Supreme Court was looking generally at the GPTA as a whole, and MCL 211.78k specifically, to determine "the jurisdiction of circuit courts to modify judgments of foreclosure when the foreclosing governmental entity unit deprives the property owner of due process." *Perfecting Church*, 278 Mich at 4. It did not interpret the requirements of MCL 211.78*l* or determine what type of notice was necessary. "It is a well-settled principle that a point assumed without consideration is of course not decided." *Aaron*, 409 Mich at 722 (quotation marks and citations omitted). For that reason, "obiter dicta lacks the force of an adjudication and is not binding under the principle of stare decisis." *People v Borchard-Ruhland*, 460 Mich 278, 286 n 4; 597 NW2d 1 (1999). Thus, this Court need not hold that MCL 211.78*l* includes an actual notice requirement just because the Supreme Court used that term in *Perfecting Church*.

Having rejected plaintiffs' position that only actual notice will prevent damages under MCL 211.78*l*, the next question is whether 2CC received "any notice required under the act."

In its recitation of the facts and trial testimony, the trial court noted:

According to a Real Estate Agreement recorded with the Cass County Register of Deeds, the purchaser of the property was plaintiff "2 Crooked Creek LLC," "By: Kava Management Company, LLC." The agreement is signed by Sergei Antipov. At trial, Antipov testified that Kava Management is the manager of 2 Crooked Creek, and that "I'm Kava Management . . . I own the company." Antipov clarified that he managed the affairs of 2 Crooked Creek through Kava Management Company.

\* \* \*

Antipov testified that he, on behalf of Kava Holdings, entered into a mortgage agreement with plaintiff Russian Ferro Alloys L.L.C. (RFA), another entity with which he is affiliated, for the 61320 Crooked Creek property. Under the agreement, Kava was listed as the mortgagor and was indebted to RFA in the amount of $3.5 million. The note was secured "by a mortgage upon land owned by 2 Crooked Creek, LLC," i.e., the land located at 61320 Crooked Creek. According to Joint Exhibit 6, Antipov—whose signature is the only signature on the document—signed the mortgage on behalf of 2 Crooked Creek and Kava. The mortgage was entered into on May 28, 2013, and recorded on July 10, 2013. The document indicates that it was prepared by Douglas D. Anderson.

Anderson, the president of RFA and registered agent of 2 Crooked Creek, is an attorney who is licensed to practice in the state of Indiana. He recalled directing the filing of the mortgage on 61320 Crooked Creek. He testified that, prior to recording the mortgage, he did not perform a title search. Anderson testified he "[d]idn't see a need" to perform a title search before recording the mortgage. When asked if a title search would have informed him of the certificate of forfeiture, Anderson conceded "I guess" it would have. Anderson testified that neither he nor RFA received notice of the foreclosure or tax delinquency, despite the fact that RFA held a mortgage interest in the property.

The trial court concluded that 2CC was not entitled to relief under MCL 211.78*l* under the facts presented. It noted that Antipov "steadfastly denied receiving any notice at any time," and that the issue of whether plaintiffs received any notice depended, in large part, on whether it found Antipov's denials credible. The trial court then held:

Having the unique opportunity as the trier of fact to observe the testimony offered, both in terms of what the witnesses had to say and how they said it, the Court concludes that Antipov's assertion that he never received any notice of any kind at any time was simply not credible. In this sense, Antipov testified that he received mail and property tax bills for all of his other properties despite his move from Bradford Lane to Baybrook, but he never received a bill or notice for this

-13-

particular property. This assertion was unconvincing. Adopting Antipov's view would require the conclusion that nearly everyone else involved in the process, including defendant, Title Check, and even the postal service, either failed in their responsibilities or conspired against him. While the Court believes that Antipov might not have appreciated the full extent of the consequences of some of the notices or that he otherwise took a cavalier attitude towards the same, the Court did not find his denial with regard to whether he received *any* notice to be credible. Consequently, the Court concludes that Antipov received *at least some* notice at some point. And, because of Antipov's assertion that he manages the affairs of 2 Crooked Creek, the latter's claim under MCL 211.78*l* must be dismissed.

\* \* \*

Furthermore, the Court concludes that Antipov and 2 Crooked Creek "received" the notice that was posted on the property. The GPTA provides that the foreclosing governmental unit-or its representative-"shall make a personal visit" to properties scheduled for foreclosure and shall attempt to personally serve occupants with notice of the statutory show-cause hearing or, at a minimum, post notice of the same in a "conspicuous manner on the property[.]" Here, by all accounts, a Title Check employee or representative made such a personal visit and posted the required notice on the property. The notice was posted on a conspicuous place on the property. Further, Title Check did so at a time when Antipov and/or 2 Crooked Creek was exercising dominion and control over the property by contracting for the construction of a home on the property. As a result, the Court concludes that 2 Crooked Creek "received" for purposes of MCL 211.78*l*, the notice posted on the property. Although 2 Crooked Creek contends it never saw this notice, there can be no dispute that the notice was received on the property in accordance with the mandates of the statute. Any purported removal of the notice-which satisfied all requirements of the statute-cannot be, and in fact has not been, attributed to defendant. Rather, the Court concludes plaintiff is charged with having received this duly executed notice under the statute. [Opinion, pp 15-16.]

Plaintiffs contend that the trial court erred in both of its determinations that 2CC received notice. Plaintiffs argue that the notice by publication and by posting were insufficient because they are both forms of constructive notice and neither, by itself, is sufficient to satisfy due process. Whether either form of constructive notice can satisfy due process is irrelevant to the issue at hand. Plaintiffs received due process; had they not, they would not be proceeding for a claim of damages under MCL 211.78*l*. The only issue is whether plaintiff received *any* notice.

Constructive notice is a legally accepted form of notice and, therefore, sufficient to fall within the confines of "any notice" under MCL 211.78*l*. Plaintiffs assert that there is no evidence of notice by publication in the record and that there was no first-hand testimony that any Title Check employee or representative posted the notice to the property. Plaintiffs' arguments misrepresent the record.

-14-

Spaulding testified that, in addition to the site visit by Makay, publication occurred on December 19 and 26, 2013 and January 2, 2014.  Joint trial exhibit 9 is a publication deadline notice indicating that a newspaper notice was scheduled for publication to run three times between December 2013 and February 2014.  Joint trial exhibit 12 consists of affidavits of publication attesting to the inclusion of the required notices in a daily newspaper on December 19 and 26, 2013 and January 2, 2014.  Furthermore, both the trial court and this Court are permitted to take judicial notice of the facts contained in this Court's opinion in the previous appeal, because such facts can no longer be disputed and are "capable of accurate and ready determination by resort to" a copy of the opinion, "whose accuracy cannot reasonably be questioned."  MRE 201(b).  Judicial notice can take place at any stage of the proceeding, MRE 201(e), including for the first time on appeal.  *People v Burt*, 89 Mich App 293, 297; 279 NW2d 299 (1979) (noting that appellate courts "can even take judicial notice on their own initiative of facts not noticed below").  In the previous appeal, this Court held: "Petitioner [here defendant] also published notice of the pending foreclosure in a local newspaper for three consecutive weeks."  *In re Cass Co Treasurer*, unpub op at 8.  Thus, the record contains sufficient evidence of constructive notice by publication.

Likewise, the record contains sufficient evidence of constructive notice and, potentially actual notice, through the posting of the notice on the property.  Plaintiffs contend that the only evidence of the "alleged" posting is joint trial exhibit 8 labeled "Affidavit of Notice of Forfeited Property – Personal Visit."  Plaintiffs claim there is no evidence in the record that any Title Check employee or representative posted this notice on the property.  Excluding the evidence contained in the notice itself—the pictures showing the document posted on the property and the fact that someone had to have personally gone to the property to discover that it was occupied by the construction of a residence—there was still sufficient evidence of the posting in the record.  Spaulding testified regarding Makay's site visit.  Antipov testified that he was familiar with James Frye, the general contractor for the home being built on the foreclosed property.  Antipov knew that Frye had signed and filed an affidavit that indicated Frye had seen the posted foreclosure notice on the property and notified someone from 2CC with that information.  Defendant's counsel asked Antipov whether he had sued Frye over the affidavit.  Antipov responded:

> I sued him over the non-performance of the contract.  *I sued him over the fact that he basically took the notice off.*  There are several issues I had with him.  *He's the only one that saw the notice.  Why did he take it off the door?*  Why did he lie about putting in cabinets that didn't exist?  I don't know.

When defendant's counsel again asked whether Antipov had sued Frye "over the affidavit specifically," Antipov stated, "I didn't sue him over the affidavit specifically.  I sued him over the fact that he got involved and he didn't fulfill the contract obligations."  Based on Antipov's testimony, there was evidence that the foreclosure notice was posted on the property, that Frye had seen the notice, and that Frye had removed the notice from the door.  And, again, taking judicial notice of the facts as recited from the previous appeal,

> a representative of [defendant] posted notice of the pending foreclosure at the actual property.  The parties do not dispute that there was a house under construction on the property at the time and that there was evidence of activity on

the property. The record reflects that notice was posted over six months before the foreclosure hearing, and at least three witnesses indicated that they saw the posting. [*In re Cass Co Treasurer*, unpub op at 8.]

On the record, then, there was sufficient evidence to support the trial court's determination that 2CC "received the notice that was posted on the property" because it "charged" plaintiff "with having received this duly executed notice under the statute" given that the notice was posted "at a time when Antipov and/or 2 Crooked Creek was exercising dominion and control over the property by contracting for the construction of a home on the property."

Plaintiffs next argue that the trial court erred because it failed to consider what notices were "required under" the GPTA and argue that defendant's failure to provide testimony or evidence about certain pre-foreclosure notices meant that defendant had conceded that 2CC did not actually receive several required notices. However, under MCL 211.78*l*, it does not matter if plaintiffs can prove that they did not receive certain notices required under the GPTA. Plaintiffs have to prove that they did not receive *any* notice. Evidence of receipt of any form of notice is sufficient to overcome a claim for damages under the statute. Accordingly, the fact that there was no evidence in the record to show whether defendant sent out various pre-foreclosure notices regarding the status of delinquent, unpaid taxes on the property is insufficient to entitle plaintiff to relief or preclude involuntary dismissal. Moreover, proof that 2CC had received certain pre-foreclosure notices would not have furthered either side's position because "a party's knowledge of a tax delinquency does not equate to notice of a foreclosure proceeding." *Ligon v City of Detroit*, 276 Mich App 120, 126; 739 NW2d 900 (2007).

Plaintiffs next argue that MCL 211.78i does not require or allow "simply mailing a notice of the show cause and foreclosure hearings by first-class mail to the same address if certified mail is returned." Plaintiffs then argue that MCL 211.78i(12) prevents first-class mail from being sufficient notice. Plaintiffs' argument fails for multiple reasons.

MCL 211.78i(12) provides:

The provisions of this section relating to notice of the show cause hearing under section 78j and the foreclosure hearing under section 78k are exclusive and exhaustive. Other requirements relating to notice or proof of service under other law, rule, or legal requirement are not applicable to notice and proof of service under this section.

This section does not prevent defendant from attempting other forms of service in the event the forms of service provided for in the statute fail. Rather, this section means that defendant is not obligated to take additional measures other than those described in the statute. Thus, this section actually precludes plaintiffs' argument that defendant should have done more to attempt to provide notice to plaintiffs.

As for defendant's practice of mailing documents by first-class mail when certified mail has gone unclaimed, this practice is permitted by MCL 211.78i(4), which provides:

If the foreclosing governmental unit or its authorized representative discovers any deficiency in the provision of notice, the foreclosing governmental entity shall

take reasonable steps in good faith to correct that deficiency not later than 30 days before the show cause hearing under section 78j, if possible.

The mailing of first-class mail when certified mail has gone unclaimed is a reasonable step taken in good faith. Indeed, this practice was recommended by the United States Supreme Court where statutory foreclosure notices are required to be sent by certified mail, but come back unclaimed. *Jones v Flowers*, 547 US 220, 234; 126 S Ct 1708; 164 L Ed 2d 415 (2006) (concluding that this practice "increase[s] the chances of actual notice" because the letter can simply be left at the property rather than having to be retrieved from the post office, and because if the recipient has moved "even occupants who ignored certified mail notice slips addressed to the owner (if any had been left) might scrawl the owner's new address on the notice packet and leave it for the postman to retrieve, or notify [the owner] directly"). Notably, *Jones* involved an Arkansas statute that required notice by certified mail, *id.* at 226, as does the statute in this case. Defendant can hardly be deemed to have acted outside the bounds of MCL 211.78i(4) when such actions are essentially required by the United States Supreme Court under circumstances identical to the present case. Indeed, having been recommended by the highest judicial authority in our country, the sending of first-class letters to the same address to which the certified letters were sent must necessarily constitute a reasonable step taken in good faith, placing it squarely within MCL 211.78i(4). Thus, contrary to plaintiffs' assertion, it constitutes notice "required under" the GPTA and can serve as a basis for finding that 2CC received notice.

In sum, MCL 211.78*l* does not require a lack of actual notice, but a lack of any notice, meaning notice of any type or kind will suffice. Here, where there was evidence in the record that the foreclosure notice was posted to the property during a time when 2CC was exercising control and dominion over the property by the building of a home, the trial court did not clearly err by charging 2CC with knowledge of the notice.

## IV. WHETHER RFA WAS ENTITLED TO NOTICE

Plaintiffs argue that the trial court erred when it concluded that RFA's claim failed because it was not entitled to notice under the GPTA. We disagree.

The trial court determined that RFA was not entitled to notice under the GPTA and, therefore, could not claim a failure to receive notice when no notice was required. Plaintiffs claim that this reasoning was erroneous because MCL 211.78*l* permits an owner who had an interest in the property, recorded or unrecorded, to seek money damages if the owner did not receive any notice. However, MCL 211.78*l*(1) requires that the owner of the interest not receive "any notice required under this act." This Court had already determined in the previous appeal that RFA had received all of the notice under the GPTA to which it was entitled:

> [B]ecause [defendant] recorded the certificate of forfeiture before RFA obtained its interest in the property, [defendant] *had no duty to send RFA any further notice of the foreclosure proceedings*. See *First Nat Bank of Chicago v Dep't of Treasury*, 280 Mich App 571, 592; 760 NW2d 775 (2008) (O'Connell, J., dissenting), adopted by reference in *First National Bank of Chicago v Dep't of Treasury*, 485 Mich 980; 774 NW2d 912 (2009) (stating that when a mortgage interest was acquired after the date that the county treasurer recorded the

-17-

certificate of forfeiture, the treasurer was not required to provide any further notice of the foreclosure proceedings to the mortgage holder). The notice recorded in the certificate of forfeiture provided sufficient notice of the pending foreclosure to any interested parties whose interests arose after that certificate of forfeiture was recorded. *Id.* [*In re Cass Co Treasurer*, unpub op at 7-8 (emphasis added).]

Notably, the opinion states that defendant had no duty to send any *further* notice. Implied within that statement is the conclusion that RFA had *already* received notice of the foreclosure proceeding by way of the recorded certificate of forfeiture located in the property's chain of title. Such constructive notice is sufficient to satisfy the "any notice" requirement in MCL 211.78*l*.

"[I]t was incumbent upon [the holder of the mortgage interest] to review the register of deeds documents when it recorded its assignment, which would have alerted it to the pending proceedings." *First Nat Bank of Chicago*, 280 Mich App at 592-593 (O'Connell, J., dissenting). Here, Anderson conceded that had he checked the register of deeds, the certificate of forfeiture would have alerted him of the foreclosure proceedings. That RFA failed to do so and "essentially disregarded the costly and laborious record systems instituted to protect its rights in the property," *id.*, should not result in it receiving a windfall in the form of an action for damages under MCL 211.78*l*. Indeed, to conclude that RFA could maintain an action for damages under these circumstances would only serve to encourage the recording of mortgages and other property interests without checking the register of deeds. A foreclosing governmental unit would never have notice of after-acquired interests absent an unduly burdensome requirement to daily check all title records, and the owners recording the after-acquired interests could always claim they received no notice because they would never receive any notice other than the recorded certificate of forfeiture, of which they could remain forever ignorant based on their own failure to review the records. Constructive notice exists for precisely this reason—to encourage people and entities to investigate prospective property interests and prevent any legal incentive to remain ignorant of others' recorded and identifiable interests. RFA cannot insulate itself against notice by intentional ignorance. The certificate of forfeiture provided constructive notice to RFA of the foreclosure proceedings. That notice was sufficient to constitute receipt of "any notice required under the act."

Given the foregoing analysis, we need not address plaintiffs' remaining argument or defendant's cross-appeal.

Affirmed.

/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-18-